1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION

3               Case No. 13-CR-20534-COOKE/TURNOFF

4   THE UNITED STATES OF AMERICA,

5
                 Plaintiff,
6                                       MIAMI, FLORIDA
    vs.                                 OCTOBER 24, 2013
7

8
    JAVIER ALVAREZ,
9

10             Defendant.

11  _____

12    TRANSCRIPT OF ARRAIGNMENT AND PRETRIAL DETENTION HEARING
              BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
13               UNITED STATES MAGISTRATE COURT JUDGE

14  APPEARANCES:

15

16  FOR THE GOVERNMENT:

                             UNITED STATES ATTORNEY'S OFFICE
17                           FOR THE SOUTHERN DISTRICT OF FLORIDA
                             99 N.E. 4th Street
18                           Miami, Florida 33132
                             BY: JONATHAN KOBRINSKI, A.U.S.A.
19  FOR THE DEFENDANT:

20                           FEDERAL PUBLIC DEFENDER'S OFFICE
                             150 E. Flagler Street
21                           Miami, Florida 33131
                             BY: MIGUEL CARIDAD, A.F.P.D.
22
    REPORTED BY:             JERALD M. MEYERS, RPR.
23                           J.M. COURT REPORTING, INC.
                             1601 N.W. 109th Terrace
24                           Pembroke Pines, Florida
                             Telephone: 954-431-4757
25                           E-mail Address: CRJM@AOL.COM

1    (Call to order of the Court)

2            THE COURT:  We are here today in the case of Javier

3    Alvarez.  It is case number 13-20534-Criminal-Cooke.

4            Can I have appearances, please.  For the United States

5    first.

6            MR. KOBRINSKI:  Your Honor, Jonathan Kobrinski on

7    behalf of the United States standing in for Brook Watson.

8            THE COURT:  Thank you.

9            MR. CARIDAD:  Good morning, Your Honor.  Miguel

10   Caridad, Assistant Federal Public Defender on behalf of

11   Mr. Alvarez.

12           THE COURT:  All right.  Why don't we go ahead and

13   arraign him first and then we can talk about the bond

14   situation.

15           MR. CARIDAD:  Yes, Judge.  We have received a copy of

16   the indictment.  We waive its reading, enter a plea of not

17   guilty and request entry of the standing order and demand trial

18   by jury.

19           THE COURT:  Okay.  I will sign the standing discovery

20   order and accept your plea of not guilty and the matter will be

21   referred to Judge Cooke for a jury trial.

22           Are we ready to go forward with the detention hearing?

23           MR. KOBRINSKI:  We are, Your Honor.  The government is

24   seeking pretrial detention based on risk of flight and danger

25   to the community.

1        At the outset we would not that the defendant faces a

2  presumption on both of those issues.

3        May I proceed by proffer?

4        THE COURT:  Yes.

5        MR. KOBRINSKI:  So Mr. Alvarez is a previously

6  convicted felon who an undercover agent with the ATF became

7  aware of was selling guns, and so he got his phone number and

8  gave him a call.  That happened on July 10, 2012.

9        During the call, the undercover agent asked Alvarez to

10  send pictures of the firearms he was selling, and Alvarez did

11  so.

12        The undercover received a picture of a Beretta 9

13  millimeter pistol and a 25 caliber pistol.

14        The undercover indicated that he was interested in

15  buying both, and Alvarez stated it would cost $600 to do so.

16        On July 12, 2012, two days at about 2:24 p.m., the

17  undercover called Alvarez and indicated that he was waiting for

18  him in a Home Depot parking lot, and Alvarez arrived about ten

19  minutes later in a black Cadillac Escalade.

20        Alvarez parked his Cadillac Escalade next to the

21  undercover's car.  At the undercover's direction, Alvarez

22  approached the undercover's front passenger window and then

23  proceeded to the rear right passenger door of his Cadillac.

24        He removed a small bag from his car and handed it to

25  the undercover.  The undercover looked at the bag and observed

1    two firearms he previously agreed to purchase, and they

2    completed the transaction.  Both of the firearms were

3    manufactured outside of the State of Florida.

4           Subsequently, at that meeting Alvarez told the

5    undercover if he needed guns or drugs, that he should contact

6    him.

7           Subsequently, on October 4th, 2012, at about 2:53 p.m.

8    the undercover purchased additional guns from Alvarez.  I am

9    glad to go into that, Your Honor, or we I will go faster with

10   regard to this proffer.

11          A similar transaction was set up --

12          THE COURT:  Wait.  What was the date of this?  I am

13   sorry.

14          MR. KOBRINSKI:  This was October 4, 2012.

15          THE COURT:  Okay.  Go ahead.

16          MR. KOBRINSKI:  And so then another transaction took

17   place in a different Home Depot parking lot, and this time it

18   involved a Beretta 9 millimeter and a Taurus 357 revolver, and

19   the purchase price was $850, and I have stated that both of

20   these transactions involved firearms, but they also involved

21   ammunition.  The ammunition that was involved was also

22   manufactured outside of the State of Florida.

23          THE COURT:  Go ahead.

24          MR. KOBRINSKI:  Available to testify is Special Agent

25   Justin Herzlich of Alcohol, Tobacco & Firearms.

1          THE COURT:  Is there any particular reason you think

2     he is a risk of flight or a danger?

3          MR. KOBRINSKI:  Well, Your Honor, as you saw, both of

4     these charges, because there is an indictment, both of these

5     charged cases occurred in 2012.

6          There was a warrant put on him.  He wasn't detained

7     post indictment which occurred in July of 2013.  A warrant was

8     issued.  He wasn't detained until several months later until

9     recently, and during the pendency of that detainment he

10    actually came under the radar, not because they found him in

11    any known address, but because he was trying to set up another

12    firearms transaction which has not been charged at this point,

13    but that transaction when he was caught and arrested for the

14    instant charges, he had in his possession 3 other firearms.

15         So the fact that he continues to sell firearms

16    illustrates the danger he posses to the community.  The fact

17    these are weapons that he is just bringing in a bag and willing

18    to sell in a parking lot of a Home Depot and the fact that it

19    was difficult to track him down, and we only tracked him down

20    based upon the fact that he was continuing to proceed in these

21    illegal transactions illustrates his risk of flight as well as

22    the fact that he is not able to be located readily.

23         THE COURT:  Well, I mean is there any evidence that he

24    knew he was under indictment and he was avoiding being

25    arrested?

```
1          MR. KOBRINSKI:  No, Your Honor.

2          THE COURT:  No?

3          MR. KOBRINSKI:  And the primary concern here is the

4  danger to the community.  There is that rebuttable presumption

5  for the risk of flight.

6          THE COURT:  Is there a presumption in a felon in

7  possession case?

8          MR. CARIDAD:  Not that I know of.

9          THE COURT:  I don't know.  I don't know that there is

10 a presumption.  Does anyone here from the government know?

11         MR. KOBRINSKI:  Your Honor, I believe a firearm

12 offense under 3152(f)(1), regardless of whether there is a

13 presumption, which I concede that we may not have met it with

14 regard to the risk of flight, the danger to the community is

15 evident based on the circumstances of the offense.

16         THE COURT:  Okay.  Well, here is my problem:

17         If you think he was very dangerous to the community

18 when you purchased the guns from him in July of 2012 and

19 October of 2012, why didn't you take him off the street then

20 instead of waiting a year or 9 months after the second

21 transaction to indict him?

22         I mean, you know, you come in here and you say this

23 guy is a danger, but yet you allowed him out for a year.

24         You allowed him to wander around for a year doing

25 whatever he was doing, which apparently you are telling me he
```

1   is still trying to sell guns.

2        It doesn't seem to me make logical sense to me that if

3   the government believes he is a danger that you would not have

4   arrested him.  You had plenty of evidence in October of 2012.

5        I mean, did the state arrest him then or did something

6   happen, or don't you know?

7        MR. KOBRINSKI:  Just one second, Your Honor.

8        THE COURT:  Okay.

9        MR. KOBRINSKI:  Your Honor, there were tabs being kept

10  on him, and it was a matter of furthering the investigation

11  that he was not brought in.

12       There was actually a discussion that he was looking

13  and considering a home invasion type of crime, but the fact is

14  that that never materialized, and so once that became evident

15  that his crew wouldn't be put together, that is when the

16  government decided to indict.

17       THE COURT:  Okay.  All right.  How do you want to

18  proceed, Mr. Caridad?

19       MR. CARIDAD:  Judge, I don't have any questions unless

20  the court is considering this last bit of proffer that he was

21  planning some sort of home invasion.

22       THE COURT:  Well, you probably ought to ask the agent

23  about it.  Do you have an agent here?

24       MR. KOBRINSKI:  We do, Your Honor.  Justin Herzlich of

25  ATF.

```
 1                THE COURT:  Okay.  Have him come up.

 2                THE CLERK:  Agent, please raise your right hand.

 3                MR. KOBRINSKI:  And, Your Honor, that last bit was

 4    only intended to illustrate the gap in the timing, not for the

 5    purpose of anything else.

 6                THE COURT:  Okay.

 7                MR. KOBRINSKI:  I don't know if that explains it..

 8                MR. CARIDAD:  Wait a minute.  Are they relying on this

 9    for detention or not, the fact that there is some allegation,

10    some information that he was involved in a home invasion or in

11    planning a home invasion?

12                THE COURT:  Well, what he says is they are relying on

13    it to -- well, I mean I would be interested in it to see if he

14    is a danger to the community.

15                MR. CARIDAD:  Okay.

16                THE COURT:  So have the agent sworn.

17                THE CLERK:  Please raise your right hand.

18    WHEREUPON THE WITNESS, ATF SPECIAL AGENT JUSTIN HERZLICH AGENT

19                   WAS DULY SWORN BY THE CLERK OF COURT

20                THE CLERK:  Please have a seat.  State your full name

21    and spell your last name for the record.

22                THE WITNESS:  My name is Justin Herzlich, J-u-s-t-i-n

23    H-e-r-z-l-i-c-h.  I am a Special Agent with the Bureau of

24    Alcohol, Tobacco, Firearms & Explosives.

25                             CROSS EXAMINATION
```

 1  BY MR. CARIDAD:

 2  Q.   Agent, can you tell me if the transaction on July 12, 2012

 3  was video recorded?

 4  A.   Yes, it was.

 5  Q.   And audio recorded as well?

 6  A.   Yes, it was.

 7  Q.   Okay.  Was my client accompanied by anybody else?

 8  A.   No, sir.

 9  Q.   Okay.  And he was selling to an informant or to an

10  undercover agent?

11  A.   To an undercover agent.

12  Q.   How about the transaction on October 4, 2012, was that

13  video recorded?

14  A.   The same situation, yes.

15  Q.   To an undercover agent and not an informant?

16  A.   That's correct.

17  Q.   And was my client with anybody else?

18  A.   No, sir.

19  Q.   Have you reviewed those video tapes?

20  A.   I have not, but the undercover agent has.

21  Q.   Now, do you have any evidence that my client was involved

22  in planning a home invasion?

23  A.   Your client met with the undercover agent subsequent to the

24  undercover purchases and expressed interest in conducting a

25  home invasion robbery, but he was unable to get a crew which is

Justin Herzlich - Cross

 1  why it did not occur.

 2  Q.  When was that meeting?

 3  A.  I don't have the report in front of me, but I believe it

 4  was subsequent to the second firearm deal.

 5  Q.  So after October 4, 2012, there was another meeting you say

 6  between my client and the same undercover agent?

 7  A.  That's correct.

 8  Q.  Was that meeting recorded?

 9  A.  It was recorded.

10  Q.  Have you listened to it?

11  A.  I have not, but the undercover agent has.

12  Q.  Okay.  And was anybody else present?

13  A.  I do not believe so.

14  Q.  Okay.  And what was said during that meeting?

15  A.  I would have to listen to the audio recording, but from

16  speaking with other agents that he expressed interest and would

17  get back to the undercover agent if he was able to find a crew,

18  and he contacted the agent and told him that he was unable to

19  find a crew.

20  Q.  Okay.  He contacted him in a telephone conversation after

21  this meeting?

22  A.  I believe they were in contact through telephone.

23  Q.  Was that conversation recorded as well?  My client said he

24  couldn't find anybody?

25  A.  I believe from speaking with the undercover agent, that all

of the conversations regarding the home invasion situation and

scenario was audio recorded.

Q.  And was anybody else recorded talking about this besides my

client?

A.  I do not believe so.

Q.  And those conversations you said happened after October 4,

2012.  Did they happen in 2013 or in 2012?

A.  I believe it was just 2012.

Q.  And that was the last contact that the undercover agent had

with my client?

A.  I would have to speak with the undercover agent, but I do

not believe so.

           MR. CARIDAD:  That's all I have, Judge.

           THE COURT:  Okay.  Does the government have any

questions?

           MR. KOBRINSKI:  No, Your Honor.

           THE COURT:  Okay.  All right.  Thank you, agent.  You

can step down.

           THE WITNESS:  Thank you.

                   [The witness was excused].

           THE COURT:  Okay.  Do you have any argument or

evidence, Mr. Caridad?

           MR. CARIDAD:  Your Honor, my client has lived here all

of his life.  He is not facing any kind of mandatory minimum

penalty.  He does not have the qualifying convictions for it.

1    He does not have, unfortunately, any property or money

2 to put up for a bond.  His girlfriend is in the courtroom

3 today.  She would be living with him.  They have been living

4 together.

5    She does not have any property or money, but she is

6 willing to sign a bond on his behalf.  And given that he is not

7 facing any kind of mandatory minimum penalty, we think the

8 court should deny the government's request and give him a bond.

9    The court's point was well taken.  If he was such a

10 danger, he would have been arrested a lot earlier.

11    They say they have information that he was talking

12 about a home invasion sometime after October, 2012 and did

13 nothing to arrest him, or they could have arrested him for

14 these guns once they hear him talking about some sort of home

15 invasion.

16    They did not.  They must have thought he was not

17 serious and could not do it.  There was no chance of him doing

18 it.

19    So the only bond we can offer though is a signature

20 bond, and we would be asking the court to do that and keep him

21 at home detained.

22    I would tell the court that I spoke to his boss, and

23 they have a job waiting for him.  As a matter of fact, they are

24 anxious to get him back to work.

25    He does air conditioner work, and his boss is very

1    happy with him.  So he has a job.  He has a place to stay, and

2    the court can set a bond so the only reason that he leaves his

3    home is that he works.

4              THE COURT:  Okay.  What does the government say,

5    Mr. Kobrinski?

6              MR. KOBRINSKI:  Your Honor, the question regarding the

7    timing is I believe superseded by the fact that when he was

8    arrested he was found.  So whether we miscalculated or

9    calculated it accurately in October, whether he was a danger or

10   whether the investigation warranted continuing monitoring, by

11   his arrest he was in possession of 3 more firearms that he was

12   intending to sell, and that illustrates the danger.

13             I would just point Your Honor to 18, U.S.C. 3142

14   (f)(1)(e) with regard to the issue that this involved the

15   possession or use of a firearm as a dangerous weapon similarly,

16   and that's incorporated in the presumption language that is

17   found in (e)(2).

18             Then, likewise, under the factors to be considered,

19   paramount among those are the nature and circumstances of the

20   offense charged.  The weight of the evidence is here we have --

21             THE COURT:  Are you telling me that there is a

22   presumption or there is not a presumption?

23             MR. KOBRINSKI:  I believe there is a presumption, Your

24   Honor, unless I am misreading 18, U.S.C. 3142.  The fact that a

25   firearm was involved, it says here --

```
 1              THE COURT:  Hold on.  3142 what?

 2              MR. KOBRINSKI:  (f)(1)(e).

 3              THE COURT:  (F)(1)(E).  Upon motion of the government

 4   in a case that involves a crime of violence, et cetera.  Okay.

 5              MR. KOBRINSKI:  Sure, Your Honor.  With regard to

 6   that, that shows that it incorporates firearms offenses such as

 7   the interstate offense.

 8              THE COURT:  Yes.

 9              MR. KOBRINSKI:  Okay.  So then if you go to --

10              THE COURT:  Hold on.  That means that I can hold him

11   as a danger to the community.

12              MR. KOBRINSKI:  Yes, Your Honor.

13              THE COURT:  But it doesn't say that.  Show me where it

14   says there is a presumption.

15              MR. KOBRINSKI:  Under (e)(2), sir, what it says is in

16   a case described in Section (f)(1).  So incorporating that part

17   we just read, (f)(1)(e), what it says is in a case described in

18   Subsection (x)(1) of this section --

19              THE COURT:  Hold on.  Hold on.  Where are you reading

20   from?

21              MR. KOBRINSKI:  From (e)(2), sir.

22              THE COURT:  Upon motion of (e)(2) or (e)(2) you are

23   saying?

24              MR. KOBRINSKI:  The previous page.

25              THE COURT:  Yes.  (E)(2).  Okay.  But then you have
```

1    something else, too.  You have to have I think if convicted of

2    a federal offense that is described in (f)(1) or the offense

3    described is committed while the person was on release pending

4    trial or a period of more than 5 years has elapsed since the

5    date of the conviction of the release of the person for the

6    offense.  So you don't get it there.

7            So under 3 is where is the rebuttable presumption

8    without all of this other stuff, and that is, you know, for a

9    drug offense, for certain offenses involving minors and under

10   924(c) which is a firearms count there.

11           MR. KOBRINSKI:  Your Honor, I believe that you are

12   correct in your assessment under that.  I inaccurately stated

13   it.

14           THE COURT:  I have been doing this for about, well,

15   all together probably about 30 years.  I have never heard of

16   that before, but I was interested.

17           MR. CARIDAD:  The government is saying something about

18   when he was arrested.

19           THE COURT:  Yes.  They indicated in their proffer that

20   when he was arrested he had --

21           MR. KOBRINSKI:  3 firearms in his possession.

22           THE COURT:  -- 3 firearms in his possession.

23           MR. CARIDAD:  I would like to ask the agent about that

24   because I don't know anything about that.

25           MR. KOBRINSKI:  I did state that in my proffer.

```
 1            MR. KOBRINSKI:  Yes, you did.  He said it in his
 2   proffer originally.
 3            MR. CARIDAD:  Could I ask the agent about it, because
 4   I don't know what they mean if he had it in his house or
 5   somebody else's car, or what.
 6            THE COURT:  Okay.  Have the agent come back up.  Come
 7   on.  We don't have all day for this thing.
 8            You can just stand right there by that microphone.
 9   You are still under oath.
10   BY MR. CARIDAD:
11   Q.  What evidence do you have that when he was arrested he was
12   in possession of guns?
13   A.  Three firearms were recovered in the vehicle he was in.
14   Q.  Was he the driver or the passenger?
15   A.  He was a passenger.
16   Q.  Okay.  Did he own the car?
17   A.  He was a passenger going to conduct another firearms
18   transaction with another undercover agent.
19   Q.  Had he spoken to the undercover agent before then to set up
20   the transaction?
21   A.  Yes, he has.
22   Q.  Was that a phone call?
23   A.  That was also audio recorded.
24   Q.  It was recorded.  So is it the same agent that he dealt
25   with before?
```

```
 1   A.   A separate agent.

 2   Q.   A separate agent.  What about the person who was driving

 3   the car, did he have anything to do with this transaction?  Do

 4   you know?

 5   A.   I am unaware of it.  He was a confidential informant and

 6   arranged to set up a transaction with another undercover agent.

 7   Q.   So the driver was a confidential informant?

 8   A.   Correct.

 9   Q.   What kind of guns were involved?

10   A.   Three firearms.  One shotgun, one rifle and one handgun.

11            MR. CARIDAD:  Thank you, Judge.  That's all I have.

12            THE COURT:  Okay.  All right.  Thank you, agent.

13                [The witness was excused].

14            THE COURT:  All right.  I am going to allow this

15   gentleman to be released under house arrest.

16            I find that I can set bond conditions of bond that

17   will reasonably assure his appearance at future proceedings and

18   also will reasonably assure the safety of the community, and

19   the reason I am doing that is because when you look at his

20   prior or his rap sheet, although he has been arrested about 10

21   times, about 7 or 8 of them relate to driving without a license

22   and petty theft.

23            He does have a grand theft with a probation violation

24   which concerns me and a burglary of an occupied structure, and

25   he has got two prostitution arrests, but there is nothing in
```

1   this report that indicates to me that he is violent.

2        The only evidence regarding that is some scant

3   evidence in regards to the negotiations to see whether or not

4   he would participate in a home invasion type robbery which did

5   not pan out.

6        So I find that I can set conditions of bond to insure

7   the court that he won't be in possession of firearms and that

8   he won't flee or be a danger to the community.

9        So what I am going to do is I am going to order a

10  $100,000 personal surety bond to be signed by the defendant and

11  the defendant's girlfriend.

12       I am going to require the defendant to reside at 1803

13  Northwest 45th Street.  There is no land line there.  He has to

14  have a land line installed prior him being released on bond.

15       He is to surrender all passport and travel documents

16  to Pretrial Services.  He is to report to them as directed.

17       He is to participate in substance abuse treatment if

18  determined necessary for agreement as well as substance abuse

19  testing as determined necessary by Pretrial Services.

20       He is to maintain or seek full-time employment.  He is

21  not to have any firearms in his residence, in any vehicle that

22  he is in or, of course, possessing it himself, and he is not to

23  have any kind of participation in the sale or movement of

24  firearms either directly or indirectly, and he is subject to

25  electronic monitoring to be paid for by Pretrial Services.

1          What hours do you work, sir?

2          THE DEFENDANT:  I work.  I do service calls, you know.

3     I work from let's say 8:00 in the morning.  It could be 9,

4     10:00 o'clock at night that I get back home.

5          THE COURT:  Okay.  All right.  You will have a curfew

6     from 10:00 p.m. until 8:00 a.m. or 7:30 a.m. in the morning.

7          THE DEFENDANT:  Okay.

8          THE COURT:  But you are only allowed to be out during

9     that time period if you are working.  So you are not allowed to

10    stop on the way home to visit your friends or to do anything

11    else.

12         If you do, you are going to be in violation of the

13    bond and I am going to put you in jail.

14         All right.  Any other conditions requested by the

15    government?

16         MR. KOBRINSKI:  No, Your Honor.

17         THE COURT:  Okay.

18         MR. CARIDAD:  I assume he can leave his home to come

19    see me?

20         THE COURT:  Yes.  He can leave after advising

21    probation to visit with his attorney and to attend to medical

22    needs or to attend to religious needs.

23         THE PROBATION OFFICER:  Your Honor?

24         THE COURT:  Yes.

25         THE PROBATION OFFICER:  I am sorry.  We have a cell

1   phone that is in place that he can be released until the land

2   line is installed, or would you just rather have the land line

3   installed?

4          THE COURT:  No.  That is fine as long as he is to get

5   a land line installed within a week then.

6          THE PROBATION OFFICER:  Okay.

7          THE COURT:  He can use his temporary, you know,

8   apparatus until then.  If you don't have a land line installed

9   within a week you need to surrender to the marshals because you

10  will be in violation of your bond.  So that's a condition.

11         Okay.  All right.  Anything else for Mr. Alvarez?

12         MR. KOBRINSKI:  No, Your Honor.

13         MR. CARIDAD:  No, sir.

14         THE COURT:  No.  Okay.  Thank you.  Thank you,

15  Mr. Alvarez.

16         (Whereupon the proceedings were concluded)

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3          I hereby certify that the foregoing is an accurate

4    transcription of proceedings in the above-entitled matter.

5
     NOVEMBER 6, 2013          S/JERALD M. MEYERS
6    _____          _____
         DATE                  JERALD M. MEYERS, RPR-CM
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25